UNITED STATES of America, Appellee,

v.

Dwayne THOMPSON, Appellant.

UNITED STATES of America, Appellee,

v.

Betty Ruth THOMPSON, Appellant.

Nos. 84–5028(L), 84–5029.

United States Court of Appeals, Fourth Circuit.

Argued July 10, 1984.

Decided Oct. 5, 1984.

---

Edward F. Connors, III, Albert Henry Counts, Jr., Alexandria, Va. (R. Ramsey Maupin, Arlington, Va., and Christopher Beatley, Alexandria, Va., on brief), for appellants.

Justin Williams, Asst. U.S. Atty., Alexandria, Va. (Elsie L. Munsell, U.S. Atty., Thomas M. Buchanan, Asst. U.S. Atty., Alexandria, Va., on brief), for appellee.

Before PHILLIPS, MURNAGHAN and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

Betty Ruth Thompson and Dwayne Thompson were convicted of involuntary manslaughter in violation of 18 U.S.C. § 1112. On appeal the Thompsons contend they were denied a fair trial when one juror was equivocal about his ability to continue the trial with an open mind. Finding merit in this argument, we reverse.

## I.

On December 11, 1982, Mrs. Thompson brought her four month old son, Julius Thompson, to the Dewitt Army Hospital. The child was pronounced dead on arrival. On December 14, 1982, Dr. Renata Greenspan, an Army pathologist, conducted an autopsy on the infant. Based on her autopsy and interviews with the Thompsons, Dr. Greenspan concluded that Julius died of meningitis complicated by malnutrition and starvation.

A federal grand jury for the Eastern District of Virginia subsequently indicted Mr. and Mrs. Thompson for the murder of their son. The Thompsons pleaded not guilty to the charge of murdering their child by starvation and gross neglect in violation of 18 U.S.C. § 1111 and § 2.

The case was tried from December 5–7, 1983, before a jury. Dr. Greenspan testified that Julius had been starved for approximately two months. To illustrate her testimony, the government presented a blown-up black and white photograph of Julius made by Dr. Greenspan three days after his death, which the trial court admitted into evidence. After viewing the photograph, one of the jurors, William Price, informed a marshal that the photograph had upset him.

When the marshal brought the juror's concern to the court's attention, the judge spoke with the juror. After the judge cautioned the juror that evidence is often upsetting, the following colloquy occurred.

THE COURT: And I want to make sure that you do understand that there are two sides to this case.

THE JUROR: I understand that, your Honor. I have sat on another jury this term. I am familiar with trying to keep an open mind throughout the trial. I am not really trying to make any statement at all, just telling you because of the way I felt after I saw it, I just really thought that it moved me quite heavily. I thought that I should tell you about it.

THE·COURT: Just so it does not move· you so heavily that you cannot listen with an open mind to what the Defend-ants have to say in the case.... I want you to make sure you can keep an open mind until you have heard all of the evidence before making any decision on the Defendants' guilt or innocence.

You have brought it to my attention, and I appreciate that, but I do want to make sure that you still have an open mind in the matter.

THE JUROR: Again, your Honor, the reason for bringing it up was because I don't think that I do, and just to be fair, I realize it's very late in the day to be telling you this, but—

THE COURT: Not late in the day. It means we will have to start all over again.

THE JUROR: I understand that. That is why this is very hard, because if I had any discrepancy, I should have said it this morning. At that time I did not. It wasn't until I saw the picture that I even felt that way at all. I understand there are two sides to the case; however, because of my personal circumstances at home and so on, in seeing that I just think that—I am just not sure that I could be totally fair. I would try to be as much as I could, but I am just not sure I could be totally fair.

(J.A. 17–18).

A bench conference followed at which time the Thompsons' attorneys moved for a mistrial. In discussing the situation with the prosecution and the defense attorneys, the judge stated that absent extraneous influence he was "not willing to let a juror halfway through a trial tell me, 'I can't be impartial anymore,'. ..." (J.A. 19). Indicating that the expense of a mistrial was unnecessary, the judge proposed to admonish Price not to make up his mind until he had heard all the evidence. The judge then denied the defendants' motion for a mistrial.

After making his ruling, the judge explained to Price that it was important to keep an open mind. The judge emphasized that all defendants are presumed to be innocent and that the burden is on the

government to prove guilt beyond a reasonable doubt. The judge then stated: "So, I will ask you to resume with the case. Do you think you can do so?" Price replied, "I will try. I am not sure, your Honor." The judge did not seek an affirmative response but said, "All right. That is all I can ask." (J.A. 23).

On appeal the Thompsons contend that the trial court should have granted a mistrial when Price indicated that the photograph had upset him and was equivocal about his ability to proceed impartially. Finding merit in this argument, we decline to address the Thompsons' other contentions.

## II.

■■■ Under the sixth amendment a criminal defendant has the right to a trial by an impartial jury. *Reynolds v. United States*, 98 U.S. (8 Otto) 145, 154, 25 L.Ed. 244 (1879). That right is compromised when the trier of fact is unable to render a disinterested, objective judgment. When a question is raised before the jury retires about whether a juror can fulfill his duties with an open mind, the district court must determine that the juror is competent to proceed before continuing with the trial. *See United States v. Krohn*, 560 F.2d 293, 297 (7th Cir.), *cert. denied*, 434 U.S. 895, 98 S.Ct. 275, 54 L.Ed.2d 182 (1977).

■■■ Although the court must give primary attention to the possibility of a biased juror, a valid concern may be the expense and loss of time associated with a mistrial. In *United States v. Taylor*, 554 F.2d 200 (5th Cir.1977), a juror expressed doubt about whether she could be open-minded two days after the trial had begun. Holding that the trial judge abused his discretion in failing to excuse the juror, the Fifth Circuit stated: "The trial judge was properly concerned about the possibility of a mistrial and the resulting expense and loss of judicial time a retrial would have caused. However, this concern must be weighed against appellants' right to a trial by an impartial jury." *Id.* at 202. Although it is within a trial judge's discretion to determine the credibility of a juror's statements of bias and prejudice, the court noted that when a juror "did not know whether she could be openminded about the trial, the concern of the possible mistrial paled to insignificance. The right to an impartial jury ... dominated all other considerations." *Id.*

■■■ The decision to grant or to deny a mistrial is within the discretion of the trial judge, and the court's decision will not be overruled on appeal except for a clear abuse of discretion. *United States v. Alonzo*, 689 F.2d 1202 (4th Cir.1982). Alternatives less drastic than a mistrial are available to the court, however. A biased juror can be dismissed and replaced with an alternate juror. Fed.R.Crim.P. 24(c). *Accord Arizona v. Washington*, 434 U.S. 497, 512 n. 31, 98 S.Ct. 824, 834 n. 31, 54 L.Ed.2d 717 (1978); *United States v. Steed*, 465 F.2d 1310, 1315–16 (9th Cir.), *cert. denied*, 409 U.S. 1078, 93 S.Ct. 697, 34 L.Ed.2d 667 (1972). Another alternative is for the parties to stipulate to a jury of less than twelve persons. Fed.R.Crim.P. 23(b). *E.g., United States v. Yonn*, 702 F.2d 1341, 1344 (11th Cir.), *cert. denied sub nom. Weeks v. United States*, — U.S. —, 104 S.Ct. 283, 78 L.Ed.2d 261 (1983) (parties stipulated to continue trial with eleven jurors).

■■■ We are convinced that this is a case in which the trial court abused its discretion in proceeding with the trial after Price gave an equivocal response to repeated questions about his ability to proceed with an open mind. At that point, the trial court should have asked for an affirmative response. When Price was not able to state unhesitatingly that he could keep an open mind, the trial court should have replaced Price with an alternate juror, or the parties should have been asked to consider stipulating to an eleven-person jury. Apparently, neither of these possibilities was even discussed, much less explored. The trial court acknowledged that Price had been convinced prematurely but decided that the expense associated with a mistrial made

that alternative untenable. We believe, however, that the court struck the wrong balance. In this case the right to an impartial jury dominated all other considerations, and Price's equivocal responses to the court's questions so compromised the defendants' right to an impartial jury that they outweighed any concerns about the expense of a mistrial.

### III.

For the foregoing reasons, the judgment of the district court is

REVERSED.

JAMES DICKSON PHILLIPS, Circuit Judge, dissenting:

With all respect for the majority's rightful concern for the defendants' right to trial by an impartial jury, I would not find an abuse of discretion in the trial judge's refusal to declare a mistrial in this case. Accordingly, I dissent.

The right to trial by an impartial jury is of course fundamental, and the majority rightly emphasizes that it must be jealously secured, even at the expense of the delay and expense and possibilities of miscarriages of justice occasioned by requiring new trials. But the means available to the system for insuring impartiality are most imperfect ones given the subtleties involved. *See McDonough Power Equipment Co. v. Greenwood,* — U.S. —, —, 104 S.Ct. 845, 848, 78 L.Ed.2d 663 (1984). The system does the best it can, relying primarily on the good sense and judgment of trial judges and on the formal *voir dire* conducted by the trial judge with counsel participating to a limited extent in their traditional adversarial roles. *See Rosales-Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). The *voir dire* of course occurs before any evidence is adduced, and its goal, so far as insuring impartiality is concerned, is, by definition, only to ferret out partiality or bias *already in place* and uninfluenced by what is yet to come in the course of trial.

Basically, once *voir dire* is completed, inquiry into ingoing bias or partiality ceas-

es; the jury is formally composed; and the working assumption is made—as it must be—that, as then composed, the jury empanelled is at least a tolerably impartial body. No one supposes that individual jurors then retain throughout a trial the same level of "impartiality" with which it is assumed, by virtue of their having survived the *voir dire* process, they entered it. Undoubtedly, depending upon the case and a variety of individual psychological and emotional and cognitive factors, their "impartiality" as to the matter in issue may wax and wane widely from start to finish, and their final vote in the jury room obviously reflects a view that is decidedly not "impartial."

This is all perfectly obvious, and I run through it only to point up the extreme delicacy—unlike that presented by arguably bias-revealing answers on *voir dire* —of the problem presented to the trial judge in this case. What was being suggested to him was not impartiality from extraneous sources that drew in question this juror's qualification to sit on the body originally empanelled. The suggestion here was that on the evidence so far adduced, and particularly because of one item, any impartiality that originally existed had at this point been significantly destroyed. The suggestion was not that an ingoing bias formed independently of the evidence had not been revealed on *voir dire* and still persisted, *cf. Greenwood* (failure to respond to *voir dire* question that may have revealed disqualification for bias), but that "impartiality" had been created by the evidence adduced. The judge accordingly was entitled to take into account that what was being reported was not in fact "partiality" of the kind sought to be identified as disqualifying on *voir dire,* but simply the juror's present state of mind in assessing the probative force of the evidence. He was also entitled to take into account that a poll of all of the individual jurors at that (or any other) time during this or any trial would probably reveal a wide range of similar feelings of "partiali-

ty" or "bias" related solely to the flow of evidence.

I have no doubt that some mid-trial revelations of newly-acquired, evidence-induced "bias" by a juror could justify, or in some cases compel, removal of the juror and either substitution or mistrial. But I think this could only be so if the revelation compelled the conclusion that the juror's trial-induced bias had so manifestly deprived him of the capacity further to weigh the evidence—both that already received and that yet to come—that the juror was now irretrievably "partial" in the originally disqualifying sense.

Of necessity, assessments of a juror's state of mind and emotional condition as it relates to his "impartiality" must be left largely to the trial judges. I think the trial judge's latitude, his range of discretion in assessing the significance of trial-induced "bias" must be even wider than the great width accorded his assessments of bias from extraneous sources. The Supreme Court has recently admonished that "an appellate court cannot easily second-guess the conclusions of the [*voir dire* judge]." *Rosales-Lopez*, 451 U.S. at 188, 101 S.Ct. at 1634. I think we must be even more deferential to trial judge's assessments of the disqualifying effects of evidence-induced juror "bias" as revealed during trial.

Here, according that wide deference, I would not find discretion abused. The juror's response was concededly ambiguous as to whether his mind remained open. But the court was entitled to take into account that all the evidence was not yet in, and that jury deliberations would be conducted under instructions that would again remind of the juror's obligations and the defendants' rights. Further, and critically for me, I think the judge was entitled to take into account the possible adverse effect on the administration of jury trials of creating a practical precedent for excusing jurors in mid-trial because of revelations of emotional distress induced by particular evidence. This undoubtedly occurs in many trials and the judge could rightly be concerned not to encourage juror conduct of this kind.

In sum, I would hold that the judge did not abuse his discretion in making the judgment that, all things considered—the juror's responses, his demeanor, the ongoing nature of the proceedings, the possibly adverse precedential consequences—the juror should not be found disqualified and mistrial ordered.